**Lee I. WIGOD, Plaintiff–Appellant,**

v.

**CHICAGO MERCANTILE EXCHANGE, Defendant–Appellee.**

Nos. 89–2716, 91–1334.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1992.

Decided Dec. 14, 1992.

---

**1.** Wuliger's law office assistants had this impression.

**2.** Wuliger later disposed of the transcripts.

Scott A. Brainerd (argued), Chicago, IL and John L. Gubbins, Monfort, WI, for plaintiff-appellant.

Jerrold E. Salzman (argued), Phillip L. Stern, Albert F. Ettinger and Glynna W. Freeman, Freeman, Freeman & Salzman, Chicago, IL, for defendant-appellee.

Before BAUER, Chief Judge, MANION, Circuit Judge, and MOODY, District Judge.[1]

BAUER, Chief Judge.

The plaintiff, Lee Wigod, sued the defendant, Chicago Mercantile Exchange, for alleged violations of federal commodities and antitrust statutes. Both parties filed motions for summary judgment, with Wigod moving for only partial summary judgment. The district court granted the defendant's motion, and following that deci-

---

1. The Honorable James T. Moody, United States District Judge for the Northern District of Indiana, is sitting by designation.

sion the defendant successfully moved for sanctions against Wigod's attorney, Scott Brainerd. Wigod appeals the grant of defendant's summary judgment motion, the denial of his motion for partial summary judgment, and his attorney appeals the sanction award. We affirm in part and remand for a recalculation of the sanctions award.

## I.

Lee Wigod was a member of the Chicago Mercantile Exchange ("Merc" or "Exchange"). The Merc is a board of trade and a designated contract market pursuant to, and governed by, the Commodities Exchange Act ("CEA"). 7 U.S.C. § 7. The CEA was originally passed in 1922, and has been amended from time to time, most recently by the Futures Trading Act of 1982 ("FTA"). In 1984, another Exchange member, Robert Alpert, claimed that he purchased twenty Standard & Poors 500 ("S & P 500") stock index futures contracts based on Wigod's oral order to buy these contracts. This is a transaction that Wigod refused to acknowledge, much less honor. Because Wigod did not buy the futures contracts, Alpert sold them to another buyer at a $33,000 loss. On the basis of this disputed trade, Wigod's clearing firm, Keystone Trading Corporation ("Keystone"), suspended his trading privileges and froze the assets in his trading account. As Wigod's clearing firm, Keystone acted as the custodian of Wigod's trading account, guarantor for any trades Wigod did not honor, and lessor of Wigod's Merc membership. *See e.g. Bernstein v. Lind–Waldock & Co.*, 738 F.2d 179 (7th Cir.1984) (describing the clearing firm role in contract market trading).

Alpert did not provide any of the trade-verifying documents he was required to file according to Exchange regulations. These regulations are called "audit-trail" rules and provide the Merc with evidence to enforce trades in the event they are disavowed. Despite the lack of audit-trail evidence, Alpert requested a Merc arbitration proceeding in an attempt to collect on the transaction. Wigod refused to participate in the proceeding on the grounds that arbitration was not mandatory and because he claims the Merc violated its own rules when it did not provide him with documents necessary to present his case. The hearing occurred as scheduled, and the arbitrator ruled to enforce the trade. Wigod was assessed the full cost of Alpert's loss, and that ruling was later reduced to judgment in the state circuit court. When Wigod refused to pay, Keystone settled up with Alpert and debited Wigod's trading account to cover the payment. Wigod's account balance was $20,101, and Keystone took it all to offset the payment. Wigod challenged the judgment in the Illinois Appellate Court. The appellate court ruled in his favor, stating that the Merc arbitration demand was not mandatory and therefore the arbitrator's decision was unenforceable because Wigod refused to participate. *Wigod v. Chicago Mercantile Exchange*, 141 Ill. App.3d 129, 95 Ill.Dec. 566, 490 N.E.2d 39 (1st Dist.1986). Despite the unenforceability of the trade-dispute arbitration, the appellate court deemed enforceable an Exchange regulation subjecting Wigod to disciplinary action for choosing not to arbitrate. *Id.* Keystone never reimbursed Wigod for the money deducted from his trading account.

On the heels of the appellate court decision, the Merc scheduled a disciplinary hearing to review Wigod's behavior associated with the arbitration proceeding. Several weeks before the hearing, the Exchange requested approval from the Commodity Futures Trading Commission ("CFTC") to double the possible fine for major offenses of Exchange rules. Perhaps not so coincidentally, the Exchange requested that the penalty be effective the day before Wigod's disciplinary hearing was to be held. Wigod requested several continuances and eventually refused to participate in the disciplinary hearing. In addition, he refused to meet with Merc officials to discuss his allegations that illegal trading was occurring in the S & P 500 pit. Wigod's disciplinary action proceeded, and a special hearing committee ("committee") of the Merc's Board of Governors ("Board") ruled against him. The commit-

tee found Wigod guilty of refusing to arbitrate, dishonest conduct, and conduct detrimental to the Exchange. Refusing to comply with a final arbitration award is considered a major offense pursuant to Exchange rule 600. Thus, he was subject to the Exchange's newly effective penalty limits. He was penalized by revocation of his Merc membership and a fine totaling $135,000— to be suspended until he sought membership reinstatement. Wigod appealed the penalty to the Board, arguing that the disciplinary action was unlawful. The Board upheld the committee's decision, and much later Wigod appealed the affirmance to the CFTC, the agency granted the authority to implement and review the CEA and alleged violations of the CEA. *American Agriculture Movement, Inc. v. The Board of Trade of the City of Chicago*, 977 F.2d 1147, 1150 (7th Cir.1992). The CFTC refused to review the proceeding because Wigod's request was not timely.

While waiting for the CFTC ruling, Wigod brought this lawsuit, alleging that the Merc violated its self-regulation procedures, the Sherman Act, and the CEA. Wigod seeks relief pursuant to these statutes and the Clayton Act. Wigod's claims survived a motion to dismiss, in which District Judge Prentice Marshall held that Wigod's allegations stated a cause of action for conspiracy to violate the antitrust laws. Case No. 87 C 3743, Order of Nov. 20, 1987, as amended Dec. 4, 1987. Judge Marshall also held that the conduct surrounding the disputed trade stated a cause of action under the FTA. *Id.* Wigod also brought pendant state law claims that survived the motion to dismiss along with the federal claims.

The case was later reassigned to Judge Conlon, who ruled on the parties' cross motions for summary judgment, granting summary judgment on behalf of the defendant. The district court found that Wigod did not present evidence to support his claims, and that as a matter of law, no antitrust violations occurred. The district court stated that the Merc, Keystone, and other alleged co-conspirators acted individually for legitimate business reasons. The district court also determined that the CEA

offered no cause of action that would grant Wigod relief. In addition, Wigod's state-law claims for tortious interference and breach of contract failed to withstand summary judgment scrutiny. The district court denied Wigod's motion to alter or amend the judgment.

The Merc then sought sanctions against Brainerd pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927. The Merc alleged that Brainerd failed to make a reasonable inquiry into the legal merit of Wigod's allegations before filing the complaint and the motion for partial summary judgment. The district court referred the matter to a magistrate judge, who found that Brainerd had not made a satisfactory inquiry regarding the viability of Wigod's claims before filing the complaint and that the motion for partial summary judgment was not well grounded in law. The magistrate judge recommended that sanctions be awarded, a recommendation that the district court adopted. Although the Merc sought $131,000, they were awarded $20,000 plus costs.

## II.

We review summary judgment decisions *de novo*, determining whether a genuine issue of material fact exists and whether the moving party must prevail as a matter of law. We also consider whether any rational trier of fact could find for the non-moving party. If not, then summary judgment is appropriate. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). Although all inferences are drawn in favor of the nonmoving party, antitrust law limits the extent to which permissible inferences from ambiguous evidence may be drawn. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656 (7th Cir.1987). Also, in complex antitrust cases, summary judgment should be used sparingly, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), unless the record is clear that the antitrust claims cannot succeed. If the claims cannot succeed, then judicial administration is served better by disposition pri-

or to trial. *Collins v. Associated Patholo-gists, Ltd.,* 844 F.2d 473, 477 (7th Cir.1988); *Lupia v. Stella D'Oro Biscuit Co.,* 586 F.2d 1163 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). Wigod cites little authority along the winding path he takes to establish his claims, and though he gets lost at several turns, we guide him to the ultimate resolution of this protracted litigation.

### A. The Antitrust Claims

Wigod claims that the Merc violated Sections 1 and 2 of the Sherman Antitrust Act by successfully conspiring with Keystone and Alpert to terminate Wigod's privileges as a floor broker, by imposing the ten-year suspension and large fines during the disciplinary proceedings, by not enforcing the audit-trail rules, and by enforcing the trade despite the lack of audit-trail documentation.

 Section 1 of the Sherman Act states that any contract, combination in the form of trust or otherwise, or conspiracy to restrain trade or commerce in the United States, is illegal. Injury to individual competitors typically does not violate Section 1, but injury to market competitiveness may do so. In most instances, consumer injury must be demonstrated before antitrust violations can be found. *Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986); *but see Stamatakis Indus., Inc. v. King,* 965 F.2d 469, 471 (7th Cir.1992) (to establish antitrust injury, the plaintiff must show consumer harm through raised prices or reduced output); *see Banks v. National Collegiate Athletic Assoc.,* 977 F.2d 1081, 1097 (7th Cir.1992) ("Whether harm to consumers is the *sine qua non* of antitrust injury is an issue over which there is currently a split in this circuit.") (citing *Wirtz* and *Stamatakis*) (Flaum, J. dissenting). The Supreme Court has determined, however, that absence of competitive change may not bar a claim if the defendant has the power to deny potential competitors access to a monopolistic market. *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). The Supreme Court recognized in *Ricci* that the CEA imposes some restrictions on free competition with respect to the type of conduct falling within rule-making or adjudicative authority of the regulatory agency governing the contract market. *Id.,* at 302 n. 13, 93 S.Ct. at 580 n. 13. That authority includes decisions of how trading may occur and who may become members, and who may become broker-dealers. The CEA authorizes restrictions on access to trading to insure the markets are protected by fair dealing. *Id.; cf. Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 367, 102 S.Ct. 1825, 1833, 72 L.Ed.2d 182 (1982). The power to deny access is an essential part of the CEA, and thereby within the Merc's authority. *See Silver v. New York Stock Exchange,* 373 U.S. 341, 364, 83 S.Ct. 1246, 1260, 10 L.Ed.2d 389 (1963); *see also Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 292, 105 S.Ct. 2613, 2618, 86 L.Ed.2d 202 (1985). Because the CEA authorizes these limits, antitrust immunity may extend to these decisions, despite their apparent anticompetitive effects. *Ricci,* 409 U.S. at 303, 93 S.Ct. at 581.

 If an individual competitor can show that the defendant's anticompetitive actions were *per se* illegal pursuant to Section 1, then antitrust remedies may be available without a showing of market injury. *Northwest Wholesale Stationers,* 472 U.S. at 290, 105 S.Ct. at 2617. *Per se* violations are actions where the nature and necessary effects which result are so plainly anticompetitive that an in depth analysis of their illegality is unnecessary. *Wilk v. American Medical Assoc.,* 895 F.2d 352, 358 (7th Cir.1990). In two leading cases, *Silver* and *Ricci,* the Supreme Court explained a contract market's liability for allegedly anticompetitive actions. Wigod relies on these decisions to support his claims. The Merc argues that those cases do not establish antitrust injury of the type Wigod complains.

In *Silver,* a nonmember broker-dealer at the New York Stock Exchange ("NYSE") was denied access to a private telephone line to the trading desks of member and

nonmember securities firms at the NYSE. After temporarily approving the lines, the NYSE later disapproved them without explanation or notice to the nonmember broker-dealer or nonmember securities firms, and without an opportunity for the disapproval to be challenged. The Supreme Court held that although the Securities and Exchange Act governed the NYSE, that law did not immunize it from antitrust liability in all circumstances. The Court went on to hold that certain anticompetitive acts resulting from contract market self-regulation may be justified and therefore immunized from antitrust liability. The Court then determined that disapproving the telephone lines was a self-regulating act, and that act was subject to government oversight. The Court determined that the NYSE actions were not a justified exception from antitrust liability because to be immune, self-regulating acts must be accompanied by appropriate procedures, including notice and the opportunity for a hearing if timely requested. *Silver*, 373 U.S. at 360–62, 83 S.Ct. at 1258–60.

The notice and hearing provisions surrounding regulatory supervision of contract markets raised a different question in *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). In *Ricci*, the Court considered what adjudicative body possesses primary jurisdiction over specific commodity rules interpretations that are relevant to reviewing antitrust claims. The plaintiff in *Ricci* was a member of the Merc when, without notice or hearing, the Exchange decided to transfer his membership to someone else by using a blank authorization form. The transfer allegedly violated the Exchange bylaws and regulations, as well as the CEA. The plaintiff sued for antitrust violations. Citing *Silver*, the Court held that the membership transfer without notice or

hearing constituted a *per se* violation unless it was justified by virtue of the Exchange's status as a contract market. The Court determined that the regulatory agency authorized to enforce the CEA should deal first with the questions of the scope, meaning, and significance of Exchange membership rules. The Court reasoned that the agency's opinion as to whether rules have been violated or abused would assist federal courts when reviewing antitrust claims. *Id.* at 305, 93 S.Ct. at 582. If the agency determined that the loss of membership violated Exchange rules, the antitrust action should proceed on its normal course. *Id.* at 304, 93 S.Ct. at 581. The Court explained that, given its expertise, the regulatory agency is in a better position to perform a factual inquiry and apply those facts when evaluating the Exchange's conduct. The Supreme Court later used *Silver* and *Ricci* as guideposts when considering the regulatory/antitrust conundrum in *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (considering whether the Securities and Exchange Act conferred antitrust immunity to rate fixing authority conferred on the New York Stock Exchange).

*Ricci* is an antitrust case stating that a federal court should use an agency decision determining whether contract market rules have been broken as a guide to finding an antitrust violation. *Id.* 409 U.S. at 305, 93 S.Ct. at 582. Wigod argues that *Ricci* merely bars relief pursuant to the CEA without prior agency review, and because he seeks antitrust relief, *Ricci* establishes a cause of action for this alleged *per se* violation. That argument misses the mark. *Ricci* decided that a governing agency decision could prove a great help in deciding antitrust claims. *Ricci*, 409 U.S at 307, 93 S.Ct. at 583.[2] It did not necessarily estab-

**2.** The *Ricci* Court did not decide what procedure to follow if the plaintiff did not seek agency review or if that review is no longer available. Wigod did not seek agency review of either the trade-dispute arbitration or the Merc's failure to enforce the audit-trail rules, and although Wigod did seek agency review of the disciplinary hearing, he did it 20 months late and the CFTC refused to excuse the delay or consider the

merits of Wigod's allegations. Commission Rule 9.21. Also, the CFTC did not institute review of the Merc's conduct. In *American Agricultural Movement, Inc. v. The Board of Trade of the City of Chicago*, 977 F.2d 1147, we stated that if the reviewing agency has discretion over what actions it can choose to review, then that discretionary authority may not be enough to shield the regulatory actions from

lish a cause of action for Wigod's claims. The Merc argues that because no violation of Exchange rules has been established, *Ricci* does not support Wigod's case. The district court decided that *Ricci* and *Silver* work against Wigod's position because the Merc gave Wigod proper notice and the opportunity to be heard, and because Wigod did not establish violations of commodity regulations. We agree that the Merc gave proper notice and gave Wigod an opportunity to be heard. We need not determine whether the Merc violated commodity regulations because the district court based its decision on Wigod's inability to support another element of his antitrust claim—conspiracy.

Wigod seeks relief under the *per se* theory, and argues that the district court performed the wrong analysis when it considered his antitrust claims. Wigod argues that the district court erred in applying a "rule of reason" analysis rather than a *"per se"* analysis. Typically, Section 1 claims are based on a market competitiveness theory and are analyzed under a "rule of reason" standard, examining the anticompetitive effects of the defendant's actions. *Phil Tolkan Datsun v. Greater Milwaukee Datsun Dealers Assoc., Inc.*, 672 F.2d 1280, 1284 (7th Cir.1982). Wigod contends that the Merc conspired with Keystone and Alpert to bar him from trading at the Exchange. Like the plaintiff in *Ricci*, he argues this "group boycott" is a *per se* violation of the Sherman Act. *Northwest Wholesale Stationers*, 472 U.S. at 290, 105 S.Ct. at 2617; *Silver*, 373 U.S. at 347, 83 S.Ct. at 1251. Based on our review of its opinion, we believe the district court correctly employed both the *per se* and rule of reason analyses. Memorandum opinion and order, June 28, 1989, at 13–15. Moreover, it found there was no conspiracy and therefore no *per se* antitrust violation.

■ We have stated that courts will find *per se* violations only after thoroughly analyzing the disputed conduct, and when a "rule of reason" analysis has inevitably resulted in a finding of anticompetitive effect. *Phil Tolkan Datsun*, 672 F.2d at 1284. Although group boycotts are often characterized as *per se* antitrust violations, *Phil Tolkan Datsun*, 672 F.2d at 1284, they are illegal only if, upon facial examination, the practice at issue is the type that always or almost always would tend to restrict competition. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). The Merc claims Wigod has failed to allege and prove a violation that reaches the threshold level of injury to the market necessary to state a *per se* claim.

■ Judge Marshall's order denying the motion to dismiss this case stated, and we agree, that Wigod's allegations of a concerted effort by the Merc to bar him from trading states a *per se* Section 1 claim under *Ricci* and *Silver*. The Merc's alleged activity is plainly anticompetitive because the Exchange is a monopolistic market that wields great control over who may be a member. Concerted efforts to summarily bar a member from belonging to the Exchange has patently anticompetitive effects. *Northwest Wholesale Stationers*, 472 U.S. at 298, 105 S.Ct. at 2621. Because he cleared the pleading hurdle by alleging a *per se* claim, Wigod no longer is required to prove the injury. He must, however, prove the other elements of the violation. Though Wigod's allegations do not fail, his proof does. He cannot show that an antitrust conspiracy occurred.

The district court interpreted Wigod's allegations as stating that the boycott resulted from two conspiracies. First, a conspiracy surrounding the trade-dispute arbitration and resulting state court action, and

antitrust scrutiny. If the discretion is historically exercised to the degree that no review is an implicit approval of the action, then antitrust immunity may attach. We explained that agency decisions are not the final authority when determining what facially anticompetitive practices will be immunized from antitrust liability pursuant to the authority granted in CEA. We,

however, do not have to decide whether the absence of CFTC review bears implicit meaning for two reasons. First, the district court did not invoke the primary jurisdiction doctrine to defer consideration of the case when the issue was raised in the motion to dismiss. Second, the denial of the motion to dismiss was not appealed.

second, a conspiracy surrounding the disciplinary actions. Wigod specifies several Merc acts in furtherance of these alleged conspiracies. As part of the first conspiracy, Wigod cites the Merc's nonenforcement of the audit-trail rules, covered by 7 U.S.C. § 6g and Exchange regulations 512 and 536. Those rules state, in various forms, that every trader, merchant, or broker who engages in trades at the Chicago Mercantile Exchange (and perhaps other contract markets, depending on the rule), must keep a written record of each transaction reflecting all important trading information.[3] Next, Wigod alleges that Keystone's payment to Alpert and the subsequent debit of Wigod's account was evidence of the conspiracy to boycott him by denying him funds. He argues that the Merc strongarmed Keystone to pay Alpert because of Alpert's close relationship to prominent Exchange members. As a further example of the conspiracy, Wigod alleges that the Merc did not provide him with discovery documents for the trade-dispute arbitration in an effort to disadvantage him as he prepared for the hearing. As part of the second conspiracy, Wigod argues that the disciplinary hearing was held not only for retaliatory purposes, but also in violation

of the Exchange rule governing such proceedings, and that the resulting penalty was particularly harsh in an effort to keep Wigod from competing in the market. The "illegal" hearing was evidence of a conspiracy to bar Wigod from the Exchange, thus depriving him of his job and source of income—the market. Unfortunately, Wigod was unable to backup his conspiracy claims with evidence.

■ To survive the Merc's summary judgment motion, Wigod must present enough evidence to establish that a genuine issue of material fact exists surrounding his claim. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56(e). Further, Wigod must present evidence that would tend to eliminate the possibility that the alleged conspirators acted independently. *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 537 (7th Cir.1986). As evidence of the conspiracies, Wigod offers his own affidavit and an affidavit of his wife Susan. The district court found that the Wigods' affidavits were tainted with hearsay statements, and the offending para-

---

**3.** Each rule states in relevant part:

Section 6g: (1) Every person registered hereunder as futures commission merchant or floor broker shall make such reports as are required by the Commission regarding the transactions and positions of the customer thereof....

(2) Every clearinghouse and contract market shall maintain daily trading records. The daily trading records shall include such information as the Commission shall prescribe by rule.

(3) Floor brokers and futures commission merchants shall maintain daily trading records for each customer in such manner and form as to be identifiable with the trades referred to in paragraph (2) of this section.

Rule 512 Every trader and broker shall have the responsibility of aiding his respective clearing firm in the clearing of his trades. It shall be the duty of every trader and broker to record each trade he makes during the day showing his own name or symbol, the name of the member firm clearing the trade, the date, price, quantity, commodity, contract month, Exchange required time designation, the opposite broker and opposite clearing member.... By the end of the trading ses-

sion, the record of all transactions shall be submitted to the respective clearing members for which or through which the trader or broker has made trades during the session....

Rule 536 RECORD OF CUSTOMERS' ORDERS AND MEMBERS' PERSONAL TRANSACTIONS.... All orders and all personal transactions of members must, at the time of execution, be recorded by the executing broker or trader on either the order form or personal trading card as the case may be. Such record must indicate the date, commodity, contract, month, quantity, price, strike price, if applicable, Exchange required time designation and opposite clearing member and broker. Violation of any of the foregoing may constitute a major offense.

By the end of the trading session the personal record of each member's transaction shall be submitted to the respective clearing member through which the trades are to be cleared. Such personal records as well as all customer orders (whether filled, unfilled, or canceled) shall be retained by the said clearing member for at least five years.

The President or his representative may require immediate proof of compliance with this rule.

graphs could not be considered. Wigod argues that the statements are not hearsay because they were made by co-conspirators in furtherance of a conspiracy. Fed. R.Evid. 801(d)(2)(E). He is incorrect. The offending paragraphs were Wigod's narrative of information told to him by unidentified parties who were allegedly told by Merc officials of retaliatory action the Merc was planning against Wigod. This presents a two level problem. To be considered, both the statements of the Merc officials to the unidentified parties and the statements by the unidentified parties must either be non-hearsay pursuant to Federal Rule of Evidence 801, or must qualify for a hearsay exception pursuant to Federal Rule of Evidence 803. Wigod has offered no evidence that the statements made to him by the unidentified parties were statements of conspirators, or in any other way escape hearsay treatment. *See Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1986). What remains are two levels of hearsay, inadmissible at trial and therefore unacceptable for consideration in opposition to a motion for summary judgment. *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 570 (7th Cir.1989). Rule 801 and Rule 803 provisions do not render the statements admissible. The statements are not admissions of a party opponent, prior inconsistent statements, or present sense impressions.

Other than the inadmissible hearsay statements, Wigod offered only one other piece of evidence, also inadmissible. That evidence was an affidavit by Leslie Jordan, who gave her "expert" opinion that the Merc denied Wigod necessary documents for the arbitration hearing in violation of Exchange rule 603, which requires the Exchange to provide all parties to the arbitration with relevant documents. The district court found her affidavit conclusory and unsupported, thus the affidavit did not comport with Fed.R.Civ.P. 56(e). Wigod argues that the district court should not have struck the affidavit *in toto.* He does not, however, include it as part of the record on appeal. Although Wigod filed a motion to submit the affidavit under seal along with the data upon which the affidavit information was based, that motion was denied. Wigod made no further effort to present the affidavit for our review. The absence of the document makes our review impossible, and we refrain from expressing any opinion about the document's admissibility. Fed.R.App.P. 10; Cir.R. 10; *Wilson v. Electro Marine Systems, Inc.,* 915 F.2d 1110, 1117–18 n. 4 (7th Cir.1990); *Fisher v. Krajewski,* 873 F.2d 1057 (7th Cir.1989).

█ Wigod's claim that he was denied discovery materials was not raised in the district court proceedings. Thus, Wigod has waived this issue for appeal. *Shields Ent., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992).

Wigod has presented no evidence of the alleged conspiracies surrounding the Keystone payment, the disciplinary hearing, or the nonenforcement of the audit-trail rules. This dearth of evidence is fatal to his claims. There is no evidence that the Merc did anything but act independently when choosing not to enforce its audit-trail rules. There is no evidence that Keystone's payment to Alpert was subject of a collusive effort with the Merc and Alpert.

█ The second alleged conspiracy concerns the disciplinary hearing. That hearing, Wigod contends, was illegal because the Committee did not have jurisdiction over him and the conducting of an improper hearing and imposing stiff penalties is further evidence of a conspiracy to boycott. To support that theory, Wigod relies on *Silver.* At the start, we point-out that Wigod's hearing comported with the *Silver* requirement of notice and opportunity to be heard. Wigod claims that the Merc exceeded its authority when holding the hearing, yet the Illinois Appellate Court determined that Wigod could be disciplined for failure to arbitrate. Conducting the disciplinary hearing was not improper or illegal. Nor was assessing the penalties. The Exchange has the authority, pursuant to the CEA and its own regulations, to punish violators within a particular range of penalties. *See* 7 U.S.C. § 9. Wigod argues that the statute was changed specifically to

"hammer" him and permanently bar him from trading commodities, and is an example of the conspiracy to violate antitrust laws. He has not shown by admissible evidence that the specific purpose of the statutory penalty increase was to harm him. Nor has he shown that the penalties were used only against him. Suspicious as the timing of the increased penalty may be, that alone is not enough to establish a conspiracy.

Wigod's *per se* theory fails because of his inability to establish a concerted effort to boycott him from the exchange. This is an essential element of his case, and without it, he succumbs to the Merc's summary judgment motion. *See Patrick v. Jasper County,* 901 F.2d 561, 565 (7th Cir.1990). After the district court determined that the *per se* theory failed, it concluded that the more appropriate theory was the rule of reason standard, which considers injury to the marketplace. On appeal, Wigod argues that the district court erred by using that analysis. The district court opinion clearly acknowledges that Wigod's argument rested on the *per se* illegality of the Merc's actions, and that the rule of reason analysis was made only in the alternative. The district court then determined that Wigod's claim failed under that analysis as well.

■ Wigod alleges that the Merc violated Section 2 of the Sherman Act. Section 2 states that every person who monopolizes, attempts to monopolize, or conspires to monopolize interstate or international trade is guilty of a misdemeanor and subject to fines and possible imprisonment. 15 U.S.C. § 2. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). He argues that the actions leading to the trade dispute and the disciplinary proceeding were a conspiracy by the Merc, Keystone and Alpert to monopolize trading in the S & P 500 futures market. Wigod argues that the arbitration hearing was an integral part of the monopolization of the market.

■ Unquestionably, monopolization pursuant to Section 2 requires a showing of possession of monopoly power in the relevant market and the willful acquisition or

maintenance of that power. *MCI Communications Corp. v. American Telephone & Telegraph,* 708 F.2d 1081, 1106 (7th Cir.), *cert. denied* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (*citing United States v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). Even assuming that the Merc possesses monopoly power in the relevant market, Wigod did not show that the Merc willfully acquired or maintained that power illegally. By disciplining Wigod and removing him as a member of the Exchange, the Merc neither acquired additional power nor performed an illegal act to maintain existing power. The Merc does not compete with Wigod. By removing Wigod from the Exchange, it did not acquire more power. Moreover, Wigod may still trade futures contracts at the Exchange through other brokers. Also, "his" membership (actually Keystone's) remains intact, therefore the number of memberships was not decreased due to Wigod's removal. This situation is easily distinguishable from the more common violation where a monopolistic power refuses to sell or deal. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The Merc is not denying members or traders the ability to deal in the S & P 500 pit.

Wigod also seeks recovery pursuant to Section 4 of the Clayton Act, a remedial statute that allows treble damages (plus attorney's fees and costs) to any person who is injured either through business or property losses by reason of anything forbidden by antitrust laws. 15 U.S.C. § 15; *Brunswick,* 429 U.S. at 485, 97 S.Ct. at 695. Obviously, Wigod cannot recover damages, treble or otherwise, because he suffered nothing from any action forbidden by antitrust laws.

## B. The Commodities and Exchange Act Claims

■ When the district court considered Wigod's commodities claims, the court understood Wigod to be complaining that the Merc did not enforce its rules against oral transactions. The district court went on to state that because no rules barred oral

transactions, the Merc did not (and could not) violate the CEA by failing to enforce those rules. In addition, the district court held that no implied cause of action existed allowing judicial review of the Exchange's disciplinary proceeding. We, however, interpret Wigod's arguments as challenging the lack of enforcement of the audit-trail regulations required under 7 U.S.C. § 6g and Exchange rules 512 and 536, and not as challenging lack of enforcement of oral transaction rules (that do not exist). We also understand Wigod to be seeking relief pursuant to an explicit statutory provision of the Futures Trading Act of 1982, that allows relief for nonenforcement of Rules 512 and 536.[4] The implied right of action he seeks is for relief pursuant to Section 6g for injuries related to the Merc's failure to require Alpert to report, and not discrediting the trade. To resolve Wigod's commodity rule violations claims, we do not need to determine if the rules were violated or if Wigod can recover under their authority because Wigod has suffered no injury related to these claims.

Wigod's primary argument relies on the CEA directive that the contract markets must "enforce all by-laws, rules, regulations, and resolutions, made or issued by it ... which relate to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements." 7 U.S.C. § 7a(8). Section 7a(8) is privately enforceable by virtue of Section 25(b)(1)(A) of the FTA, which asserts that a contract market, or a clearing house of that contract market, may be liable for actual damages incurred from a violation of Section 7a(8).[5] See Bernstein v. Lind–Waldock, 738 F.2d

179, 185 (7th Cir.1984); cf. Bosco v. Serhant, 836 F.2d 271, 274 (7th Cir.1987). Wigod seeks relief under the same basic provisions as the plaintiff in Bosco. In that case, the plaintiff sought an implied right of action under the CEA provision requiring the Exchange to enforce all rules and regulations. Whether Section 6g provides such an implied right is a question we need not address. Wigod has failed to show he was injured by nonenforcement of the audit-trail rules.

In Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), the Supreme Court held that an implied private right of action existed in the CEA for violations of its antifraud provisions, specifically the provision barring price manipulation. There, the plaintiffs sought damages from their brokers, and in some claims, against the New York Mercantile Exchange and its officials. The Court considered the contemporary legal framework in which the CEA was amended in 1974 and determined that Congress recognized the existence of a private implied right of action. The Court also determined that Congress intentionally did nothing to limit this right when drafting the amended statute. In response to an invitation in Curran, Congress created an explicit private right of action for a contract market's failure to enforce its rules, regulations, and bylaws. American Agricultural Movement, 977 F.2d at 1153; Bernstein v. Lind–Waldock & Co., 738 F.2d 179, 185 (7th Cir.1984).

Wigod argues that his penalties—removal from Exchange membership, prohibition from reapplication for membership for ten years, and $135,000 if he reapplies—consti-

---

**4.** Wigod calls our attention to CFTC regulations that encompass the same behavior covered by Exchange Rules 512 and 536. He apparently uses these regulations as examples of the duty imposed on Alpert to report and the Merc's bad faith in not enforcing reporting requirements and discrediting the trade. We do not perceive his argument as seeking an implied private right of action for damages resulting from the alleged CFTC regulation violations.

**5.** The statute states in relevant part:
 (b) Liabilities of organizations and individuals; bad faith requirement; exclusive remedy

(1)(A) A contract market or clearing organization of a contract market that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by section 7a(8) and (9) of this title ... shall be liable for actual damages sustained by a person who engaged in any transaction on or subject to the rules of such contract market or licensed board of trade to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaws, rules, regulations, or resolutions.

tute actual injury. He claims that these penalties "proximately terminated [his] livelihood", and were all a result of nonenforcement of Exchange regulations. His premise is flawed. The injury (if one occurred) would have been enforcement of the trade without the benefit of verifying documentation required under the rules. All that became moot upon the Illinois Appellate Court decision rendering the arbitration judgment unenforceable. The disciplinary hearing and resulting penalties simply are not a result of nonenforcement of the audit-trail rules. Rather, they are the result of the method in which Wigod challenged the Alpert trade—by refusing to participate in arbitration. Thus, Wigod has suffered no actual injury from nonenforcement of the audit-trial rules, and without actual injury, Wigod's CEA claims fail under the explicit terms of the statute. Although the district court failed to discuss Wigod's claim of a Section 6g implied private right of action in the summary judgment decision, we can resolve it simply. Without injury, Wigod is also without standing to assert an alleged implied right of action. *Lujan v. Defenders of Wildlife,* —— U.S. ——, —— - ——, 112 S.Ct. 2130, 2135–37, 119 L.Ed.2d 351 (1992).

We affirm the district court decision to grant summary judgment on behalf of the defendants. As is clear from our analysis, partial summary judgment on behalf of Wigod would have been improper because he was not entitled to judgment as a matter of law. We affirm the decision denying that motion.

## C. The Sanctions Award

■ The defendants moved for sanctions pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1927, stating that Brainerd failed to make an adequate pre-filing inquiry of the factual and legal merits of both the compliant and the partial motion for summary judgment. We review sanctions determinations under an abuse of discretion standard. *Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 936 (7th Cir. 1989) (*en banc*). The sanctions issue was considered by a magistrate judge, who issued a report and recommendation ("re-

port") to the district court. The district court adopted the report in all respects. The report stated that one of the elements that influenced its conclusion that Brainerd had not performed a proper pre-filing inquiry of the partial motion for summary judgment was his failure to address one of our cases, *Cardoza v. Commodity Futures Trading Commission,* 768 F.2d 1542 (7th Cir.1985). The district court determined that the *Cardoza* holding barred a claim for judicial review of the Merc disciplinary hearing. What Wigod asked for, however, was a review of the legality of the underlying procedures upon which the disciplinary hearing was based. His argument was that if the underlying procedures were part of illegal activity, it follows that the disciplinary procedures would be inherently defective. In that context, Wigod asked for relief from the Merc penalties. He did not ask for specific review of the disciplinary hearing. We acknowledge the subtlety of this distinction, but recognize that if Wigod's trade-dispute claims had merit, then the basis for the disciplinary hearing, not the hearing itself, may be inherently flawed.

In *Cardoza,* the plaintiff sought relief from a membership decision she alleged violated 7 U.S.C. § 7a. She made her claim through an implied right of action purportedly conferred by the CEA. At the time the plaintiff's cause of action arose, Congress had not yet enacted Section 25(b)(1)(A). Section 25(b)(1)(A) explicitly authorizes a private right of action for violations of Section 7a. Among other cases, we cited *Rosee v. Board of Trade,* 311 F.2d 524 (7th Cir.1963), *cert. denied,* 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1964), which held that the CEA did not provide an implied remedy to review disciplinary proceedings at the Chicago Board of Trade. *Cardoza,* 768 F.2d at 1554. We held that a private right of action did not exist to enforce Section 7a, and distinguished our decision from *Curran,* taking the same route as the Second Circuit did in *Sam Wong & Son, Inc. v. New York Mercantile Exchange,* 735 F.2d 653 (2nd Cir. 1984). In *Sam Wong* the Second Circuit

narrowly construed *Curran,* and held that the implied private right of action recognized by the Supreme Court was limited to situations of nonenforcement of rules barring price manipulation. The *Sam Wong* court found no implied private right of action against the New York Mercantile Exchange for its failure to revise contracts in violation of a CEA mandate. *Id.* at 666–69.

The magistrate judge did not properly distinguish *Cardoza* from Wigod's situation. *Cardoza* did not address the new statute because the conduct giving rise to that cause of action occurred prior to the FTA effective date. The actions leading to Wigod's trade-dispute claims are covered by the statute because they occurred in 1984, after the effective date. Although Wigod did not cite *Cardoza* in his partial motion for summary judgment, he cited the statute on the first page, establishing under what theory he was proceeding. Thus his partial motion for summary judgment based on Section 25(b)(1) is acceptable. Requesting relief from activities that result from allegedly illegal behavior under Section 25(b)(1)(A) is not an argument completely without legal merit. Using *Cardoza* as a basis for sanctions is inappropriate.

■ The magistrate judge found other behavior by Brainerd to be sanctionable. The court determined that Brainerd's pre-filing inquiry into the facts of Wigod's case was objectively unreasonable for several reasons. First, Brainerd did not meet with the attorneys who represented Wigod in the trade-dispute arbitration and the state court proceedings challenging that arbitration. Second, Brainerd did not attempt to meet with Merc representatives or anyone else having knowledge of the situation before filing the lawsuit. Knowing the severity of the penalties sought against defendants, the complexity of the legal issues involved, and the apparent weakness of the conspiracy theory, the district court found this to be unreasonable. Defending an antitrust suit requires refuting allegations of conspiracies, an expensive and time consuming proposition. Losing an antitrust suit opens the door for treble damages, generally running into the millions of dollars. For these reasons, a vigorous defense of the actions, despite their seeming lack of merit, is financially in the defendant's best interest. *See Mortell v. Mortell Co.,* 887 F.2d 1322, 1328 (7th Cir.1989). Therefore, a plaintiff bringing an antitrust suit has a responsibility to litigate with thorough investigation. Our review reveals no abuse of discretion with regard to the finding of insufficient pre-filing inquiry. *Triad Assoc., Inc. v. Chicago Housing Authority,* 892 F.2d 583, 596 (7th Cir.1989).

■ Our next duty is to determine if the improper sanctions based on the *Cardoza* case require us to remand for recalculation of the award. The Merc asserted that the sanctionable conduct generated expenses exceeding $200,000, but the Merc sought $131,000. The magistrate judge determined that Brainerd was liable for all $131,000. Recognizing that Brainerd may not possess the means to pay that amount, the court considered *in camera* information regarding Brainerd's ability to pay. The court reduced the award to $20,000, a level that would sufficiently punish Brainerd, curb further abuses, but remain within his ability to pay. Brainerd was assessed sanctions more than six times that which he was required to pay. At least $20,000 of the $131,000 most likely was due to the insufficient pre-filing inquiry. Although apportioning the amount for which he was accountable may still result in a figure greater than that which he is able to pay, and therefore the amount again may be reduced to a figure within Brainerd's means, we nonetheless remand the sanctions issue for apportionment and recalculation. Wigod is to be sanctioned only for his insufficient pre-filing inquiry.

### III.

For the foregoing reasons, we affirm all aspects of the district court decision except for the sanctions based on the legal basis for Wigod's claim. We remand for recalculation of the sanctions award.