**NORTHLAKE MARKETING &
SUPPLY, INC., Plaintiff,**

v.

**GLAVERBEL S.A., et al., Defendants.**

**No. 92 C 2732.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 4, 1994.

Anthony S. DiVincenzo, Campbell & Di-Vincenzo, Chicago, IL, for plaintiff.

Jerold I. Schneider of Spencer, Frank & Schneider, Washington, DC, Blake L. Harrop

of Sonnenschein, Nath & Rosenthal, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

After two false starts, Northlake Marketing & Supply, Inc. ("Northlake") has filed its five-count Second Amended Complaint ("SAC") against Glaverbel S.A. ("Glaverbel"), Foseco, Inc. ("Foseco") and Fosbel, Inc. ("Fosbel") (the latter two are collectively termed "Foseco–Fosbel" for convenience).[1] Three counts seek judicial declarations only against Glaverbel and Fosbel as to United States Patent Nos. 4,792,468 (" '468"), 4,920,-084 (" '084") and 4,489,022 (" '022"), all owned by Glaverbel and exclusively licensed to Fosbel: Count I requests a ruling that Northlake is not infringing Patents '468 and '084, while Counts II and III allege that all three patents (1) are invalid under 35 U.S.C. §§ 101, 102, 103 and 112 and (2) are unenforceable for having been fraudulently or inequitably obtained. Counts IV and V accuse all three defendants of having obtained and of seeking to enforce those allegedly invalid patents in violation of (1) the Sherman and Clayton Antitrust Acts (15 U.S.C §§ 1, 2 and 15) and (2) the common law of unfair competition.[2]

In earlier litigation Glaverbel and Fosbel had sued Northlake and other parties in the United States District Court for the Northern District of Indiana, asserting two claims of patent infringement. On those claims Magistrate Judge Andrew Rodovich granted summary judgment in Northlake's favor, finding that Glaverbel and Fosbel had failed to meet their burden of establishing a genuine factual issue as to the existence of such infringement. Northlake had also responded with counterclaims asserting both the invalidity of Patent '022 (and another patent not at issue here—see n. 11) and violations of federal antitrust and state unfair competition law. After a bench trial Magistrate Judge Rodovich dismissed those counterclaims on March 31, 1992 on the ground that Northlake had failed to meet its burden of proof.

As a consequence of that last ruling this Court's December 9, 1992 memorandum opinion and order held that this is not the proper forum for Northlake to advance its claims based on Patent '022, so all such claims were stricken from the SAC. This Court's April 7, 1993 memorandum opinion and order summarized the effect of two other rulings that it had made:

> In combination, this Court's oral ruling of December 17, 1992 and its brief February 26, 1993 memorandum opinion and order (the "Opinion") held that to the extent that Northlake's current antitrust and unfair competition claims arise out of any alleged conduct up to and including the date of Judge Rodovich's decision, those claims are barred against all three defendants on claim preclusion grounds.

Now before this Court is the Foseco–Fosbel Fed.R.Civ.P. ("Rule") 56 motion for summary judgment on the remaining temporal segment of Northlake's antitrust and unfair competition claims—that is, any such claims covering the period from April 1, 1992 to the present.[3] For the reasons set forth in this memorandum opinion and order, the Foseco–Fosbel motion is granted, those claims are dismissed with prejudice and Foseco is dismissed as a party to this action.

### Summary Judgment Standards

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of

---

1.  Only Foseco and Fosbel have been served with process. Glaverbel has not and hence is not subject to this Court's jurisdiction.

2.  Although neither the SAC nor any of the submissions on the current motion suggest just which jurisdiction's law should supply the rules of decision in that last respect, this Court's disposition of Count V renders it unnecessary to address that choice of law question.

3.  Neither side has filed the General Rule 12 statements that are required by this District Court to facilitate the resolution of Rule 56 motions, though each has submitted evidentiary materials together with its memoranda. All of this opinion's factual recitals are therefore gleaned from those memoranda (when properly supported by attached exhibits, deposition testimony or affidavits). This opinion refers to only one other submission: Northlake's January 18, 1994 Further Supplemental Response, which will be cited as "P.Supp.Mem.—."

a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

■ But it is not the movant alone that bears a burden under Rule 56. In accordance with the teaching of *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53 and the plain command of Rule 56(c) and (e), a nonmovant plaintiff has the burden of coming forth with evidence in support of its case. Here is how *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir.1994) has framed the issue:

> When as in the present case a defendant moves for summary judgment on the ground that the plaintiff lacks evidence of an essential element of his claim, the plaintiff is required by Fed.R.Civ.P. 56, if he wants to ward off the grant of the motion, to present evidence of evidentiary quality—either admissible documents or attested testimony, such as that found in depositions or in affidavits—demonstrating the existence of a genuine issue of material fact.

And *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir.1994) has paraphrased Rule 56(e) to convey the same message:

> The non-movant may not rely upon mere allegations, but must present specific facts to show that a genuine issue of material fact exists.

■ Not just any tendered material will suffice to meet that burden. Such proffered material must meet the strictures of the Federal Rules of Evidence so as to be admissible at trial (*Winskunas*, 23 F.3d at 1267; *Waldridge v. American Hoechst Corp.*, 24 F.3d

918, 921 n. 2 (7th Cir.1994)).[4] Where a non-movant fails to present evidence that satisfies its burden in opposing the movant's Rule 56 motion, the motion must be granted (*Waldridge*, 24 F.3d at 920–21).

### Parties

Northlake is a competitor of Foseco, Fosbel and Glaverbel in the United States market for the ceramic welding and repair of industrial ovens used principally by the steel, glass and copper industries (Foseco's Vice President of Administration Anthony Money ("Money") Dep. 11, 24; Northlake's President James Hamilton ("Hamilton") Aff. ¶¶ 1, 4). Foseco is a wholly-owned Delaware-incorporated great-grandchild subsidiary of Dutch company Foseco Holding BV (Money Dep. 4, 14). Fosbel is an Ohio corporation whose stock is held 51% by Foseco Holding BV and 49% by Glaverbel (Money Dep. 21).[5] Of the nine seats on Fosbel's Board of Directors, Foseco controls five and Glaverbel controls the other four (Money Dep. 23).

Under the joint venture agreement pursuant to which the participants formed Fosbel, Foseco manages Fosbel and supplies it with the powders used in ceramic welding, while Glaverbel supplies technical advice and has made Fosbel the exclusive licensee of its Patents '468 and '084 (Money Dep. 10–11; Fosbel's Director of Business Development Chuck Zvosec Dep. 28, 73; P.Supp.Mem.Ex. C at 2). Fosbel supplies the actual ceramic welding services to industrial customers (Money Dep. 24).

### Lack of Evidence Supporting Northlake's Claims

For nearly 30 years (ever since the decision in *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 176–77, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965)) it

---

4. While affidavits are not ordinarily the proper form in which to admit evidence at trial, they are clearly sufficient to meet a nonmovant's burden under Rule 56(e) as long as they are "admissible in content, in the sense that a change in form but not in content, for example a substitution of oral testimony for a summary of that testimony in an affidavit, would make the evidence admissible at trial" (*Winskunas*, 23 F.3d at 1268).

5. To be more precise, Money Dep. 21 discloses only that "a Glaverbel Group Company" is the other shareholder. Because this Court has no jurisdiction over Glaverbel anyway, that other shareholder will simply be referred to as Glaverbel for ease of designation.

has been established that a suit for violation of the antitrust laws may be predicated on a defendant's attempted enforcement of a fraudulently procured patent (though since *Walker v. FMC* the Federal Circuit has supplanted the concept of "fraud on the Patent Office" with a term that has somewhat broader connotations—"inequitable conduct"—the basis for an antitrust claim remains that of actual fraud in the procurement; see, e.g., *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1417–18 (Fed.Cir.1987) and cases cited there). Northlake's SAC *alleges* just such conduct by Foseco and Fosbel, but that is not enough for Rule 56 purposes. In response to Foseco–Fosbel's motion Northlake must present sufficient evidence to support the reasonable inference that Foseco or Fosbel or both acted or attempted to act in such a manner after March 31, 1992. Northlake runs aground on that requirement.

■ More specifically, Northlake invokes *Walker v. FMC* by alleging that defendants hindered its ability to secure ceramic welding work by telling prospective customers that Northlake was infringing Glaverbel's patents (remember that it is a predicate of Northlake's claim, which is being accepted as true solely for purposes of dealing with the current motion, that the patents were procured by inequitable conduct). To support that allegation Northlake cites to Hamilton's affidavit. What follows is a summary of what he says there.

In June 1992 Hamilton asked Inland Steel ("Inland") about the possibility of Northlake's replacing Fosbel in performing such work on Inland's coking ovens (Hamilton Aff. ¶ 4). On August 5, 1992 Northlake performed a trial repair to Inland's satisfaction, and Northlake was then invited to submit a price for such repair work and was also advised that Fosbel would be told of Northlake's successful trial and would be "given the opportunity to submit a new price in response to Northlake's quotation" (Hamilton Aff. ¶¶ 5, 6). During an October 1992 meeting with Inland supervisor Willie Johnson ("Johnson") Hamilton was told that Northlake had submitted a lower bid than Fosbel but that Fosbel's Vice President of Sales Ernie Goffe ("Goffe") and salesman Jerry Verdi ("Verdi") had told Johnson that Fosbel was going to sue Northlake for patent infringement, a warning that Johnson had reported to his supervisor Alan Ellis (Hamilton Aff. ¶¶ 9–10). Johnson suggested that Northlake should present evidence to Inland of its "legal rights" to use the ceramic welding process, and it then submitted a copy of Magistrate Judge Rodovich's grant of summary judgment in its favor in the Indiana litigation (Hamilton Aff. ¶¶ 11–12). Northlake ultimately secured Inland's business and began doing ceramic repair work for it on January 25, 1993 (Hamilton Aff. ¶ 13).

Northlake's problem is that the key pieces of evidence in that account—the claimed statements by Fosbel employees Goffe and Verdi that interfered with Northlake's effort to get business from Inland—face problems posed by the hearsay rule and other rules of evidence. Although *Johnson*'s testimony as to the making of such statements would clearly have been admissible as nonhearsay under Fed.R.Evid. ("Rule"[6]) 801(d)(2)(D), the asserted statements were not heard directly by Hamilton but were rather relayed to him by Johnson. If the story of what Johnson told Hamilton were being offered for the truth of the matter asserted (that is, to prove that Goffe and Verdi had really said what Johnson reported to Hamilton), those purported Goffe–Verdi statements would be inadmissible hearsay (Rule 801(c) and 802). With those statements thus out of the case for that purpose, this Court would have been tendered no evidence that Fosbel or Foseco voiced any warnings or threats of suits for infringement of Glaverbel's patents (*Wigod v. Chicago Mercantile Exch.*, 981 F.2d 1510, 1518–19 (7th Cir.1992) (stating the rule in connection with a similar Rule 56 motion brought against antitrust claims); accord, *Winskunas*, 23 F.3d at 1268; *Randle v. La-Salle Telecommunications, Inc.*, 876 F.2d

---

**6.** No confusion should be engendered by this opinion's dual use of the term "Rule" to denote both the Federal Rules of Civil Procedure (all of which bear single-digit or two-digit numbers) and the Federal Rules of Evidence (all of which bear three-digit numbers).

563, 570 n. 4 (7th Cir.1989) and cases and treatises cited there).

But suppose that Hamilton's affidavit testimony as to what Johnson told him were somehow independently admissible when viewed in a clearly nonhearsay sense—that is, simply as evidence of the fact and of the content of Johnson's statement, rather than for its truth. In that event the Hamilton testimony itself could be admissible, but *not* to serve Northlake's ultimate goal of establishing the truth of Johnson's account of the Fosbel threats (the impermissible hearsay purpose described in the last paragraph). Would the result be any different in the special environment of a summary judgment motion, remembering that Northlake's Rule 56 task is not to *prove* the asserted fact, but only to create a *reasonable inference* of its existence?

Factfinders are regularly instructed, as provided in Rule 105, as to the limited use of evidence that is admissible only for one purpose, rather than unconditionally (see, e.g., *Moylan v. Meadow Club, Inc.*, 979 F.2d 1246, 1247–48, 1250 (7th Cir.1992); *Thronson v. Meisels*, 800 F.2d 136, 143 (7th Cir.1986)). And just as the constraints of the hearsay rule prevent Hamilton's testimony from being employed to *prove* that Johnson was truthful in attributing the claimed statements to Goffe and Verdi, so too those constraints forbid the use of that same testimony to create an *inference* to the same effect (see generally 1 Jack Weinstein & Margaret Berger, *Weinstein's Evidence* ¶ 105[03] (1993); G. Michael Fenner, *Law Professor Reveals Shocking Truth About Hearsay*, 62 Mo.–K.C.L.Rev. 1, 58–62 (1993))—even as logical as such an inference might be if the Johnson statement were permitted to be taken as gospel.[7] Again Northlake would strike out, even on the most favorable basis on which Hamilton's statement could arguably be considered.

Indeed, even if that had not been the case Northlake could not survive the present summary judgment motion on the basis of the evidence now under consideration. It will be remembered that the Rule 56 standard co-incides with that under Rule 50(a), which asks whether "there is no legally sufficient evidentiary basis for a reasonable jury to have found for [Northlake] with respect to that issue"—that is the teaching of *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). If a jury were to find on the sole strength of Hamilton's affidavit that the asserted Goffe–Verdi statements had been made to Johnson, the purposes that underlie the hearsay rule would be seriously subverted: Look at the impossible task that faces a cross-examiner who is required to challenge the truth of such a *twice*-removed alleged statement—to pierce two levels of absent witnesses. That is the stuff of which a Rule 403 exclusion is fashioned: Attenuated probative force of the purported underlying statement, heavily overbalanced by unfair prejudice to the party opposing admissibility. So even if such a hypothetical (though analytically unsound) premise were to be adopted, this Court would perforce still exclude the testimony under discussion.

That then leads to consideration of the next proposed item of evidence. Hamilton also says that Northlake has pursued other welding work but with very limited success: Other than Inland it has obtained work only from Geneva Steel, and that not until February 1993 (Hamilton Aff. ¶ 17). Hamilton has attempted to solicit work from other companies, including six for whom Northlake had done such work before the Indiana litigation, but in each case the prospect raised the possibility of Northlake's continued infringement of Glaverbel's patents and the consequential threat of lawsuits by Fosbel and Glaverbel (Hamilton Aff. ¶¶ 16, 18). Although Hamilton does not say so expressly, he clearly seeks to imply that Northlake's limited success in securing work stems from actions by Fosbel or Foseco or both.

In those respects Northlake does not even reach a level that would bar the evidence in hearsay terms. This time it does not offer even hearsay evidence, by way of Hamilton's

---

7. After all, the other alternative would seem to be that Johnson had fabricated the making of the Goffe–Verdi statements—and with what motive, to what end?

affidavit or otherwise, that the various companies learned of Northlake's alleged patent problems from Foseco or Fosbel (or even from Glaverbel for that matter). Given that evidentiary void, Northlake fails to create a reasonable (that is, a fact-based) inference that it was actually Fosbel's or Foseco's conduct that had created the concerns voiced by those companies—the necessary predicate for Northlake's claim that Fosbel or Foseco has threatened to enforce the patents in a manner violating federal antitrust and state unfair competition laws. It is Northlake's burden to present evidence sufficient to create a genuine issue, and not for this Court to indulge pure speculation as to the requisite causal connection. Total silence of the evidentiary record on that crucial issue is necessarily fatal to Northlake under Rule 56(e). Thus that second part of Hamilton's affidavit cannot create a reasonable inference of improper conduct by either Fosbel or Foseco during the relevant time frame.

■ Still another piece of evidence to which Northlake refers is this April 15, 1992 letter sent to Northlake's lawyers by Glaverbel's Washington, D.C. counsel (P.Supp.Mem. Ex. P):

> As you know, this office represents Glaverbel, S.A. in patent matters. We wish to "formally" bring the following to your attention.

> The use in the United States of ceramic welding powder by Exo–Ram [8] and/or Northlake of the type which was seized by Court Order in Belgium and tested by an independent laboratory designated by a Court-appointed expert, for refractory repair, infringes at least claim 1 of U.S. Patent No. 4,792,468. Furthermore, the powder mixture per se infringes at least claim 1 of U.S. Patent No. 4,920,084. Duplicate copies of each patent are enclosed by fax and mail. As you know, the corresponding Belgian patent has been asserted against your clients in the litigation in Belgium.

> The first tentative corroboration we had from Northlake that the same type of pow-

der was actually used in the United States was the November 22nd, 1991 Declaration of Samuel E. May. This information was, of course, confirmed by Mr. May's testimony in the recent case of *Glaverbel and Fosbel v. Northlake et al.*

In Germany, the challenges to validity of the corresponding German patent by Northlake Marketing & Supply, Inc. and by Lichtenberg Feuerfest GmbH have been rejected by the German Patent Office, and neither has appealed this determination.

Your "invalidity defense" that the "modified drawing of the '468 patent" which showed a *refractory* particle distribution from U.S. Patent No. 3,684,560, was also the distribution curve of the oxidizable particles (of '560) has been established as mathematically impossible at the deposition of Mr. Mottet which Mr. Brezina took in August 1991.

If you have any other defenses to validity and/or infringement, we invite you to share them with us promptly. Absent very strong, credible, non-cumulative evidence supporting invalidity and/or non-infringement received in this office by Friday, April 24th, 1992, we have been authorized to proceed with a patent infringement lawsuit against your clients based upon infringement of U.S. Patent Nos. 4,792,468 and 4,920,084.[9]

As against Glaverbel that letter would unquestionably be admissible, and it is just as unquestionably evidence of Glaverbel's conduct during the relevant time period.

But the difficulty here is that Northlake seeks to use the letter as evidence of improper conduct by Foseco or Fosbel, and not against the defense chair that is unoccupied by Glaverbel. It was after all Glaverbel's counsel who wrote the letter and who put Northlake on notice of a threatened patent infringement suit by Glaverbel itself. Nothing in the letter suggests any conduct by Foseco or Fosbel: Neither is mentioned in the letter, and nothing in the letter suggests

---

8. Exo–Ram is "an affiliate of Northlake" (P.Supp.Mem. 5).

9. [Footnote by this Court] As of the parties' last submission in this case (on March 23, 1994) no such suit had been filed.

that either is joining in Glaverbel's indicated enforcement activity.

■ To rely on that item of evidence in opposition to the Foseco–Fosbel Rule 56 motion, Northlake must present some evidence linking one or both of them to Glaverbel by way of "contract, conspiracy or combination" so that it may reasonably be inferred that the content of the letter—assuming only for the moment that it states a sufficient predicate for an antitrust claim—is ascribable to one or both of them (*Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 397 (7th Cir.1993)). It is not enough that Fosbel as Glaverbel's licensee would derive benefit from the latter's successful enforcement of the '468 and '084 Patents against Northlake.

One added factor bears mention. By definition any evidence against Fosbel or Foseco or both must reflect its or their post-March 31, 1992 conduct, because only that conduct is now at issue in this case. Even if some inference could be drawn that either or both of them was or were involved in triggering Glaverbel's letter (again a matter of sheer speculation), nothing has been offered to support an inference that such hypothetical conduct antedated April 1, 1992 rather than taking place during the ensuing two weeks.

Hence this additional proposed item of evidence is also of no help to Northlake in creating any reasonable inference that Foseco or Fosbel or both engaged in conduct after March 31, 1992 that is violative either of federal antitrust law (see, e.g., *Greater Rockford*, 998 F.2d at 397; *Wigod*, 981 F.2d at 1519; *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 48–55 (7th Cir.1992)) or of the common law of unfair competition.

■ That leaves, as the final gossamer strand in Northlake's effort to weave an evidentiary web, its reference to this Glaverbel "Press Release" (P.Supp.Mem.Ex. S):

The High Court of Justice in London recently gave a decision in favor of Glaverbel in the action for infringement of its ceram-

ic welding process brought, in June or 1987, against the British Coal Corporation (BCC) and other companies of that group. The compensation which will have to be paid by BCC is likely to amount to several millions of sterling pounds; the definitive amount, however, must still be determined by the court. We have not yet been advised if BCC will file an appeal.

The ceramic welding process is a novel process developed by Glaverbel for the hot repair of industrial furnaces, mainly in the glass, coke, steel and copper metallurgy fields. It consists of repairs to the refractory linings of these furnaces by means of physicochemical reactions between oxidizing gases, finely divided metals and refractory particles at temperatures in excess of 2000° C.

This technique, considered revolutionary at the time of its invention, remains today the process with the highest performance. It is protected throughout the world by patents and commercialized by Fosbel, a joint venture established in 1981 between the Belgian Glass Group, Glaverbel and the British Group, Foseco. Fosbel has a worldwide commercial network at its disposal, with companies established in Europe, Japan, the United States and Brazil.

Although the version of the Press Release tendered to this Court is undated, the final Foseco–Fosbel reply memorandum acknowledges that it was issued after March 31, 1992. Moreover, Hamilton asserts without contradiction that he received the Press Release in the mail from Fosbel and also that it was "published in several trade publications" (Hamilton Aff. ¶¶ 14–15). At last, then, Northlake has presented some evidence of conduct that both (1) occurred after the watershed date and (2) is at least linked to one of the defendants over whom this Court has jurisdiction.

■ That however is not enough. To advance its antitrust claims Northlake must also create at least a reasonable inference of bad faith enforcement of Patents '084 and '468 against it.[10] But when the Press

---

10. Northlake's Supp.Mem. 2 suggests that Sherman Act liability may be imposed merely for the fraudulent procurement of a patent. That is

simply wrong—it must also be shown that the patent has been used after its issuance in an anticompetitive fashion (*Brunswick Corp. v. Rie-*

Release is viewed *alone*—as it must be because it is really Northlake's only evidence in opposition to the current Rule 56 motion—it is *un* reasonable to construe the document as supporting any such inference.

In principal part the Press Release is a forthright factual report of the result of Glaverbel's U.K. litigation, coupled with a general description of Glaverbel's ceramic welding process. Its only assertion that is even arguably relevant to this case is that Glaverbel's process is also covered by other patents elsewhere (inferentially including the United States) and is commercialized by Fosbel. But those mere avowals of fact cannot reasonably be construed as being the type of action that rises to the level of enforcement (or threatened enforcement) of a patent, which is an essential predicate of Northlake's antitrust claims.

Case law in this area (involving claims of patent misuse) consistently rest on actual lawsuits charging infringement of the tainted patents (see *FMC Corp.*, 835 F.2d at 1412, 1417–18; *Argus Chem. Corp. v. Fibre Glass–Evercoat Co.*, 812 F.2d 1381, 1381, 1384–85 (Fed.Cir.1987); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 876–77 (Fed.Cir.1985); *Brunswick*, 752 F.2d at 265–66, 268; *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993 (9th Cir.1979)). That is hardly surprising, for such claims (as was also true in the seminal *Walker v. FMC* litigation) are most typically brought as counterclaims to patent infringement suits (*Brunswick*, 752 F.2d at 265).

It may be possible, though this Court is aware of no case that has expressly so held, that some conduct short of instituting a suit (or directly threatening such a suit) could constitute the requisite enforcement action. But whatever that hypothetical lesser quantum of conduct might be, it surely would have to be more than the Delphic reference to the *existence* of a patent or patents that Northlake offers here. If it were otherwise, any such reference—however innocuous—could trigger exposure to an antitrust claim. Any such rule would be absurd, for common sense teaches that some more assertive conduct is required before a patent holder can be said, within the meaning of the antitrust laws, to be enforcing its patent.

It is also worth noting that the Press Release does not refer to any particular United States patent. At the time that the Press Release was issued and sent to Hamilton, Glaverbel had licensed to Fosbel not only the patents that are the subject of this litigation—'468 and '084—but also '022, the validity of which is not open to challenge here.[11] That ambiguity only serves further to underscore the unreasonableness of the inference that Northlake wishes to call into play here: when the subject of an assertion is itself unclear, it is hard to ascribe any specific assertion to the speaker.[12]

And so this final strand, like the others already discussed, cannot support the weight that Northlake wishes it to bear. It has produced no admissible evidence that reasonably supports the inference of conduct that is a sufficient predicate for an antitrust claim.

### *Northlake's Substantive Claims*

What has been said to this point suffices to dispatch Northlake's Counts IV and V. But this opinion should not close without a few words about the lack of any showing of at

gel *Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984)).

11. Northlake and Foseco–Fosbel agree that the British patent referred to in the Press Release corresponds to Glaverbel's United States Patent No. 3,684,560—a patent that had expired as of March 31, 1992. That being so, the only United States patents to which the Press Release could have referred were one or more of Patents '468, '084 and '022.

12. Northlake's Supp.Mem. 20 argues that because it "prevailed on Glaverbel's infringement claims under the '022 patent" in the Indiana litigation, the Press Release can logically be referring only to Patents '468 and '084. That contention is seriously misleading. In that prior litigation Magistrate Judge Rodovich did grant summary judgment to Northlake on Glaverbel's claim of patent infringement, but after a trial on the merits he held that Patent '022 was *valid*. Thus the statement in the Press Release that Glaverbel's ceramic welding process "is protected throughout the world by patents and commercialized by Fosbel" cannot by any stretch of the imagination be labeled a bad faith assertion. At least as to Patent '022, Glaverbel held and holds a patent that enjoys a judicial finding of validity.

least one essential element of any such antitrust claims as those asserted in Count IV.

This Court of course realizes that Northlake has been responding to the Fosbel–Foseco motion and that the focus of that motion has been on the insufficiency of the evidence already discussed. But the fact remains that the teaching of *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553 is that the Rule 56 movant need not "support its motion with affidavits or other materials *negating* the opponent's claim." As plaintiff, it is Northlake that bears the burden of proof of its antitrust claims in the summary judgment context, just as it would at trial (*id.* at 324–25, 106 S.Ct. at 2553–54).

It might therefore have been expected that Northlake would at least have taken a pass at addressing, in the form of admissible evidence, the prima facie elements of its antitrust claim. After all, Rule 56(e) could not make it more plain that the nonmovant plaintiff cannot rest on its pleadings, just as it could not at trial. Having said that, however, this Court would be reluctant to rest its own ruling here on a ground that Northlake might argue that it had not understood it was obligated to meet (even though it should have had such an understanding). What follows, then, is a brief exposition of another fundamental gap in Northlake's support for its antitrust claims—but as an independent deficiency on Northlake's part, unnecessary to the already-pronounced defeat of those claims.

▮ As already stated, the purported basis for Northlake's Sherman Act claims is the type of conduct proscribed by *Walker v. FMC:* the alleged fraudulent procurement and the later maintenance and enforcement of patents (*Abbott Lab. v. Brennan,* 952 F.2d 1346, 1354 (Fed.Cir.1991); *Brunswick,* 752

F.2d at 264–66). But the mere possession of a "patent does not establish presumption of market power in the antitrust sense" (*Abbott Lab.* 952 F.2d at 1354; accord, *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1367 (Fed.Cir.1984)). So even if Northlake had established a reasonable inference of such conduct by Foseco or Fosbel or both after March 31, 1992, Northlake would still have to show by the same standard that "the other elements necessary to a [Sherman Act] § 2 case are present" (*Walker v. FMC,* 382 U.S. at 174, 86 S.Ct. at 349). Although far less common, Sherman Act § 1 cases can also be based on the fraudulent procurement and bad faith enforcement of patents (see, e.g., *United States v. Singer Mfg. Co.,* 374 U.S. 174, 200, 83 S.Ct. 1773, 1787, 10 L.Ed.2d 823 (1963) (White, J., concurring)), in which event the antitrust elements required by that section must be similarly shown.

Sherman Act § 1 violations must involve (*Denny's Marina, Inc. v. Renfro Productions, Inc.,* 8 F.3d 1217, 1220 (7th Cir.1993)):

(1) a contract, combination or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury.

In comparison, Sherman Act § 2 requires a showing of (*United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)):

(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Those respective requirements of "unreasonable restraint of trade" and "monopoly power"[13] share the essential ingredient of dem-

13. Sherman Act § 1's "restraint of trade" element is assessed in terms of "the competitive significance" of defendant's conduct (*National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); see also *Wisconsin Music Network, Inc. v. Muzak Ltd. Partnership,* 5 F.3d 218, 221–22 (7th Cir.1993); *Banks v. NCAA,* 977 F.2d 1081, 1087–88 (7th Cir.1992), quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107–08 (7th Cir.1984)). Sherman Act § 2 also ap-

plies a competition-based definition (*United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956)):

Monopoly power is the power to control prices or exclude competition.

Accord, such cases as *American Academic Suppliers, Inc. v. Beckley–Cardy, Inc.,* 922 F.2d 1317, 1319 (7th Cir.1991); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1414 (7th Cir.1989).

onstrating an adverse effect on competition in the "relevant market."

As for Northlake's Section 1 claim, the determination of that competitive impact must be undertaken using the Rule of Reason, for Northlake has offered no evidence that the patents were used in a "manifestly anticompetitive" manner so as to justify the conclusion that defendants' actions are per se Sherman Act violations (*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)). And what are crucial both to the Rule of Reason analysis and to assessing the existence of Section 2 "monopoly power" are the delineation of the relevant market (*Fishman v. Estate of Wirtz*, 807 F.2d 520, 531–32 (7th Cir.1986)) and evidence of the defendant's power in that market (*Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704; *Wilk v. American Medical Ass'n*, 895 F.2d 352, 359 (7th Cir.1990)). "Relevant market" is defined as being made up of "commodities reasonably interchangeable by consumers for the same purposes" (*du Pont*, 351 U.S. at 395, 76 S.Ct. at 1007). Identification of the relevant market is crucial in evaluating an antitrust claim because, as Justice O'Connor observed in her concurrence to *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 37 n. 7, 104 S.Ct. 1551, 1572 n. 7, 80 L.Ed.2d 2 (1984):

> A common misconception has been that a patent or copyright, a high market share, or a unique product that competitors are not able to offer suffices to demonstrate market power. While each of these three factors might help to give market power to a seller, it is also possible that a seller in those situations will have no market power: for example, a patent holder has no market power in any relevant sense if there are close substitutes for the patented product.

Here Northlake has offered no evidence whatever as to the relevant market. Without data on such issues (for example) as (1) the relevant customer base (whether just coke ovens used by steel companies or whether also encompassing, for example, industrial ovens utilized in other industries [14]) or (2) even more critically, whether the relevant market is limited to the type of ceramic welding process offered by Fosbel and Northlake (rather than other methods of repair being "reasonably interchangeable" with that process), it is impossible to draw any reasoned inference as to the presence or absence of Fosbel's market power. That problem is further compounded by the total lack of information as to the presence or absence of other competitors in the marketplace. Perhaps Northlake and Fosbel are the only suppliers in the relevant market (whatever it may be), but it is entirely possible that they are only two entrants in a market filled with numerous other competitors. And uncertainty is Northlake's enemy. Silence on that issue (as on the several other issues) cuts against Northlake, as the plaintiff having the burden of proving (or in this instance, of creating reasonable inferences in support of) its claim.

Northlake's failure to present evidence as to the relevant market, which is crucial element of its antitrust claim would independently justify the granting of summary judgment in Foseco–Fosbel's favor (*American Hoist*, 725 F.2d at 1366; *cf. Abbott Lab.* 952 F.2d at 1354–55 (a like holding in the Rule 12(b)(6) dismissal context)). As already stated, though, this Court has no wish to court still another claim of wounded surprise (however unjustified) on Northlake's part. This opinion will rest on Northlake's utter failure of proof in evidentiary terms, which has occupied the principal part of the discussion.[15]

---

14. Fosbel says that it services ovens used by the steel, glass and copper industries, while Northlake's filings mention only its repair work of coke ovens used by the steel industry.

15. This may be somewhat more charitable than Northlake deserves. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554 teaches that:

> the burden on the moving party [under Rule 56(c)] may be discharged by "showing"—that is, pointing out to the district court—that there

is an absence of evidence to support the nonmoving party's case.

And Foseco–Fosbel did just that when they said this in their May 26, 1993 memorandum opposing Northlake's motion to vacate this Court's earlier grant of summary judgment in favor of Foseco–Fosbel:

> We are aware of no authority which allows Northlake, in response to summary judgment, to selectively avoid certain issues of proof.

### Conclusion

As to Northlake's Count IV antitrust claim, it has not met its Rule 56 burden of creating a genuine issue of material fact. Because Northlake's Count V common law unfair competition claim is based on the same alleged conduct by Foseco or Fosbel or both, each of them is entitled to a judgment as a matter of law on both counts. Those counts are therefore dismissed with prejudice.

No claim against Foseco now remains in this action, and it is hence dismissed entirely as a defendant. In accordance with *National Metalcrafters v. McNeil,* 784 F.2d 817, 821 (7th Cir.1986) this Court expressly determines under Rule 54(b) that there is no just reason for delay and expressly directs the entry of final judgment in favor of Foseco.

As to Fosbel, however, Northlake's Counts I through III remain alive. Accordingly this Court sets a status hearing for 8:45 a.m. August 18, 1994, at which time those remaining parties will be expected to discuss the necessary future proceedings in the case.

For example, there is no basis to avoid proof of the relevant market in an antitrust suit.
When this Court granted that motion to vacate, Northlake had clearly and specifically been placed on notice of its burden to prove the relevant market as part of its antitrust claim. It should really make no difference that Foseco–Fosbel did not advert to the issue on the current go-round, for the burden on Northlake never changed—and it was never met. All the same, this Court does not (though it well might) rest this opinion on that failure by Northlake.